[Cite as *State v. Capers*, 2011-Ohio-2443.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 10CA009801 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| LAMAR M. CAPERS | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 09CR079681 |

DECISION AND JOURNAL ENTRY

Dated: May 23, 2011

DICKINSON, Judge.

INTRODUCTION

{¶1} During an altercation with his girlfriend, Tiara Miller, Lamar Capers discharged a gun into the floor of Ms. Miller's neighbor's apartment. Following a bench trial, Mr. Capers was convicted of having a weapon while under disability with a firearm specification, possession of cocaine, and aggravated menacing. He was sentenced to a total of seven years in prison. Mr. Capers has appealed. His convictions are partially affirmed and partially reversed because: (1) the trial court did not deny him his right to self-representation and he invited the court's indulgence of his requests to be involved in his own defense; (2) the trial court did not commit plain error by failing to inquire into the attorney-client relationship; (3) Mr. Capers has not demonstrated that his lawyer's performance was deficient or that there is a reasonable probability that, but for his lawyer's performance, the result of his trial would have been different; (4) Mr. Capers' convictions were based on sufficient evidence and were not against the manifest weight

of the evidence; (5) the trial court did not commit plain error by permitting an eye-witness to testify about Mr. Capers' violent history with Ms. Miller; (6) and the trial court's post-release control error requires reversal of only the part of the judgment imposing post-release control.

BACKGROUND

{¶2}   In the early morning hours of December 15, 2009, Jillian Brewer Roark awoke to find her neighbor, Ms. Miller, inside Ms. Roark's apartment.  According to Ms. Roark, Ms. Miller was upset and crying because she was fighting with her boyfriend, Mr. Capers.  Mr. Capers was outside in the parking lot yelling that he would shoot Ms. Miller's car if she did not allow him to enter the locked apartment building.  After he calmed down, Ms. Roark opened the back door for him and ran back to lock her apartment door before he could enter the building.  Soon, Mr. Capers was knocking on her door and trying to coax Ms. Miller to open it.

{¶3}   According to Eric Ortiz, who was sleeping in Ms. Roark's apartment when Ms. Miller arrived, Mr. Capers did enter Ms. Roark's apartment and convince Ms. Miller to go across the hall to Ms. Miller's apartment to discuss their differences.  About five minutes later, Ms. Miller ran back to Ms. Roark's apartment screaming and locked the door again.  Soon, however, Mr. Capers successfully convinced Ms. Miller to open Ms. Roark's door so that they could talk.  As soon as the door opened, Mr. Capers put something to Ms. Miller's temple, held it there for a few seconds, and then began to lower it.  Mr. Ortiz and Ms. Roark testified that, by the shape of the item and the way Mr. Capers held it, it appeared to be a gun hidden inside a Crown Royal bag made of purple cloth.  As Mr. Capers began to lower the gun, it went off, shooting a hole in Ms. Roark's living room floor.  According to both Ms. Roark and Mr. Ortiz, everyone, including Mr. Capers, seemed shocked to hear the gun go off.   Ms. Miller and Mr. Capers both testified

that Mr. Capers did not have a gun, they never saw a gun, and they did not hear anyone shoot a gun.

{¶4} Ms. Roark said that Mr. Capers continued to try to talk to Ms. Miller, but Ms. Miller refused to speak to him until he got rid of the gun. Ms. Roark saw Mr. Capers go into the hallway with the gun and then enter Ms. Miller's apartment without it. Ms. Miller went into the hallway and came back with the gun a few seconds later. Ms. Miller gave the gun, still in the Crown Royal bag, to Ms. Roark and asked her to hide it. Then Ms. Miller returned to her apartment with Mr. Capers. Ms. Roark hid the bag in the pocket of a coat that was hanging in her closet and called the police. When police arrived, they found and arrested Mr. Capers in Ms. Miller's apartment.

{¶5} The State charged Mr. Capers with discharging a firearm at or into a habitation with a repeat violent offender specification, having a weapon while under disability due to a prior conviction for a felony offense of violence with a firearm specification, having a weapon while under disability due to a prior drug conviction with a firearm specification, possession of drugs, aggravated menacing, and domestic violence. Mr. Capers waived his right to a jury and tried the case to the court.

{¶6} At trial, Mr. Capers expressed some displeasure with his lawyer's performance. After the State had presented its two eye-witnesses, Mr. Capers asked the Court to recall them because his lawyer had refused to ask some questions that Mr. Capers wanted his lawyer to ask. Mr. Capers made it clear that he would like for his lawyer to continue representing him, but that he wanted more control over his defense. The trial court told him it would consider recalling the witnesses to allow Mr. Capers an opportunity to ask additional questions. Later, during the direct examination of a police officer, Mr. Capers objected and posed a question. The trial court

told him to wait until his lawyer had had an opportunity to cross-examine the witness. After the lawyers finished their examinations of the witness, the trial court allowed Mr. Capers to ask the witness whether the bullet hole could have been in Ms. Roark's living room floor before this incident. After the State rested, the trial court allowed Mr. Capers to make a list of questions he would have liked to have asked the State's witnesses. The court then recalled the two eye-witnesses as the court's own and asked a series of questions from Mr. Capers' list. Finally, at the close of all evidence, Mr. Capers moved the court to allow him to present his own closing argument. His lawyer agreed and the trial court granted the motion. When it came time to give the closing argument, however, Mr. Capers and his lawyer asked to share the allotted time and the trial court agreed.

{¶7} The trial court found Mr. Capers not guilty of discharging a firearm at or into a habitation and not guilty of domestic violence. It dismissed the repeat violent offender specification and found him guilty of all other counts and specifications. The court then merged the two counts of having a weapon while under disability and the multiple firearm specifications so that Mr. Capers was convicted of one count of having a weapon while under disability with a single firearm specification. He has assigned six errors for review.

POST-RELEASE CONTROL

{¶8} Mr. Capers' first assignment of error is that the trial court's judgment must be vacated and this matter remanded for re-sentencing due to a post-release control notification error. He has argued that, although the trial court correctly included mandatory post-release control in his sentencing entry, it failed to notify him of post-release control during his sentencing hearing. The transcript of the sentencing hearing does not include any reference to post-release control.

{¶9} On March 17, 2010, the trial court sentenced Mr. Capers on one count of having a weapon under disability, with a firearm specification, a third-degree felony; possession of drugs, a fourth-degree felony; and aggravated menacing, a first-degree misdemeanor. The trial court included in the sentencing entry a mandatory, three-year term of post-release control.

{¶10} Under Section 2967.28(B)(3) of the Ohio Revised Code, if the trial court imposes a prison term for a third-degree felony that is not a sex offense, but which involved a threat of physical harm, it must impose a mandatory, three-year term of post-release control. The trial court is also required to notify the offender at the sentencing hearing that he will be supervised under Section 2967.28 after he leaves prison. R.C. 2929.19(B)(3)(c). In 2004, the Ohio Supreme Court held that, "[if] a trial court fails to notify an offender about postrelease control at the sentencing hearing but incorporates that notice into its journal entry imposing sentence, it fails to comply with the mandatory provisions of R.C. 2929.19(B)(3)(c) . . . and, therefore, the sentence must be vacated and the matter remanded to the trial court for resentencing." *State v. Jordan*, 104 Ohio St. 3d 21, 2004-Ohio-6085, at paragraph two of the syllabus. Following the adoption of Section 2929.19.1 of the Ohio Revised Code, however, the Supreme Court held that, "[f]or criminal sentences imposed on and after July 11, 2006, in which a trial court failed to properly impose postrelease control, trial courts shall apply the procedures set forth in R.C. 2929.191." *State v. Singleton*, 124 Ohio St. 3d 173, 2009-Ohio-6434, at ¶1. The remedial statute "applies to offenders who have not yet been released from prison and who . . . did not receive notice at the sentencing hearing that they would be subject to postrelease control[.]" *Id.* at ¶23 (citing R.C. 2929.19.1(A) and (B)).

{¶11} As Mr. Capers was sentenced after the effective date of Section 2929.19.1, his sentence, although defective due to a notification error, is not a nullity. See *State v. Singleton*,

124 Ohio St. 3d 173, 2009-Ohio-6434, at ¶26; see also *State v. Fischer*, 128 Ohio St. 3d 92, 2010-Ohio-6238, at ¶26. Mr. Capers' first assignment of error is sustained, but the remedy requested is denied. The cause will be remanded for the limited purpose of allowing the trial court to follow the procedures set forth in Section 2929.19.1 of the Ohio Revised Code.

HYBRID DEFENSE

{¶12} Mr. Capers' second assignment of error is that the trial court committed plain error by permitting him to act as co-counsel with his court-appointed lawyer. Although the State has agreed with Mr. Capers that the trial court erred in this regard, it has not appealed the trial court's judgment. As Mr. Capers has pointed out, criminal defendants have no constitutional right to hybrid representation. *State v. Martin*, 103 Ohio St. 3d 385, 2004-Ohio-5471, at ¶31. "Although appellant has the right either to appear pro se or to have counsel, he has no corresponding right to act as co-counsel on his own behalf." *Id.* (quoting *State v. Thompson*, 33 Ohio St. 3d 1, 6-7 (1987)). The Ohio Supreme Court has held that "[n]either the United States Constitution, the Ohio Constitution nor case law mandates . . . hybrid representation." *Id.* (quoting *Thompson*, 33 Ohio St. 3d at 6). It has mentioned the many troubling issues that can arise from hybrid representation, including the difficulty of determining, until after the trial "whether the defendant had enjoyed representation by counsel, self-representation or hybrid representation, for '[t]he question is one of degree.'" *Id.* at ¶34 (quoting *Parren v. State*, 309 Md. 260, 269 (1987)). In this case, this Court need not determine "on what side of the murky line" Mr. Capers' representation fell. *Id.* at ¶35 (quoting *Parren*, 309 Md. at 269).

{¶13} The doctrine of invited error prohibits any party from taking advantage of "an error that he himself invited or induced." *State v. Rohrbaugh*, 126 Ohio St. 3d 421, 2010-Ohio-3286, at ¶10 (quoting *State ex rel. Kline v. Carroll*, 96 Ohio St. 3d 404, 2002-Ohio-4849, at ¶27).

"[A] litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible." *State v. Allen*, 2d Dist. No. 23738, 2010-Ohio-3336, at ¶52 (quoting *Lester v. Leuck*, 142 Ohio St. 91, 93 (1943)). In this case, Mr. Capers repeatedly requested that witnesses be asked certain questions and, in the end, requested an opportunity to make his own closing argument. The trial court largely indulged Mr. Capers' requests, and neither the prosecutor nor Mr. Capers' own lawyer objected. The transcript reveals that the trial court went out of its way to ensure that Mr. Capers did not leave the courtroom feeling that an important question had not been asked and Mr. Capers seemed pleased with the court's efforts in that regard. Assuming that the trial court's indulgence of Mr. Capers' requests was erroneous, Mr. Capers cannot take advantage of an error that he himself invited.

{¶14} Furthermore, Mr. Capers has correctly argued that the applicable standard of review is plain error because he did not object in the trial court and preserve this issue for appeal. Crim. R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Although an appellate court may notice defects affecting substantial rights that were not brought to the attention of the trial court, such notice is "to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St. 2d 91, paragraph three of the syllabus (1978). In order to prevail on a claim of plain error, the defendant must show that, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Murphy*, 91 Ohio St. 3d 516, 532 (2001) (quoting *State v. Campbell*, 69 Ohio St. 3d 38, 41 (1994)).

{¶15} Mr. Capers has not made such a showing in this case. He has not explained how he believes the outcome of his trial "clearly would have been otherwise" had the trial court

denied his requests to be more active in his own defense. He has not argued that a particular question he posed or something he said in his own closing argument prejudiced his case. Indeed, because his case was tried to the bench, there was little cause for concern in that regard. See *State v. Olah*, 146 Ohio App. 3d 586, 593 (2001) ("A trial judge in a bench trial is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision."). The alleged error did not affect a substantial right. This is not the exceptional circumstance in which this Court should take notice of plain error in order to prevent a manifest miscarriage of justice.

{¶16} Mr. Capers has also argued that the trial court effectively denied him his constitutional right to self-representation, but he never asserted that right. A defendant must assert his right to self-representation in an unequivocal and timely manner, or it is forfeited. *State v. Cassano*, 96 Ohio St. 3d 94, 2002-Ohio-3751, at ¶38. Additionally, a defendant will not be granted the right to represent himself absent a valid waiver of his right to counsel. *State v. Martin*, 103 Ohio St. 3d 385, 2004-Ohio-5471, at ¶38-39 (citing Crim. R. 44C)). There is no evidence in the record that Mr. Capers ever waived his right to counsel. When Mr. Capers expressed his displeasure with his lawyer's failure to ask the State's witnesses some questions that he had asked him to pose, he told the court unequivocally that he "would appreciate if [his lawyer] finishes the trial[.]" Mr. Capers never asked the court to discharge his lawyer nor did he ever demand to represent himself at trial. Therefore, the trial court did not deny him his right to self-representation. Mr. Capers' second assignment of error is overruled.

FAILURE TO REPLACE TRIAL COUNSEL

{¶17} Mr. Capers' sixth assignment of error is that the trial court committed plain error by failing to inquire into the attorney-client relationship and replace the court-appointed lawyer

when Mr. Capers first complained about him during the State's case-in-chief. In support of this assignment of error, Mr. Capers has cited the Sixth District case of *State v. Williams*, 123 Ohio App. 3d 233 (1997), and the Fourth District case of *State v. King*, 104 Ohio App. 3d 434 (1995).

{¶18} In *Williams*, the Sixth District Court of Appeals held that, "where defense counsel places the trial court on notice that continued representation places counsel in an ethical dilemma, and counsel raises issues of his client's constitutional rights, the court must conduct a careful and in-depth review into all the facts and circumstances." *State v. Williams*, 123 Ohio App. 3d 233, 236 (1997). In *King*, the trial court had failed to consider the defendant's pro se motion to dismiss trial counsel that he had filed the first day of trial. The Fourth District held that, "[if], during trial an indigent defendant questions the effectiveness and adequacy of assigned counsel, it is the duty of the trial court to inquire into the complaint and make the inquiry part of the record." *State v. King*, 104 Ohio App. 3d 434, 437 (1995).

{¶19} This Court has held that "[a]n indigent defendant has a right to competent counsel, not a right to counsel of his own choosing." *State v. Harrison*, 9th Dist. No. 20080, 2001 WL 39600 at *1 (Jan. 17, 2001) (quoting *State v. Blankenship*, 102 Ohio App. 3d 534, 558 (1995)). There is no constitutional right to a "meaningful attorney-client relationship." *Id.* (quoting *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)). "Rather, an indigent defendant is entitled to the appointment of substitute counsel only upon a showing of good cause, such as conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust result." *Id.* (quoting *Blankenship*, 102 Ohio App. 3d at 558).

{¶20} This case is not similar to *State v. King*, 104 Ohio App. 3d 434 (1995), because Mr. Capers never asked to fire and replace his court-appointed lawyer. It is not similar to *State v. Williams*, 123 Ohio App. 3d 233 (1997), because Mr. Capers' lawyer did not express concern

for his client's constitutional rights nor raise the specter of an ethical dilemma. Neither Mr. Capers nor his lawyer alleged a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict that led to an unjust result. The only real conflict between Mr. Capers and his lawyer appears to have been due to the fact that the lawyer refused to ask various questions that Mr. Capers insisted must be asked of certain witnesses. That conflict appears to have been completely diffused by the trial court's decision to recall the witnesses and ask them at least some of the questions Mr. Capers had requested. For the most part, Mr. Capers intended to rely on his lawyer's expertise and asked that he continue to represent him for the course of the trial. Under these circumstances, there was no need for the trial court to inquire further into the nature of the attorney-client relationship in order to determine whether there was good cause to dismiss and replace Mr. Capers' court-appointed lawyer. Mr. Capers' sixth assignment of error is overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶21}** Mr. Capers' fourth assignment of error is that he was denied effective assistance of counsel because his lawyer failed to hire an expert, ask certain questions, and respect his client. "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St. 3d 378, 388-89 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). In order to demonstrate that the deficient performance caused him prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *State v. Bradley*, 42 Ohio St. 3d 136, 142 (1989) (quoting *Strickland*, 466 U.S. at 694).

{¶22} First, Mr. Capers has argued that his lawyer should have hired an expert to test the substance identified as cocaine base and the gunshot residue kit used on Mr. Capers. "A decision by trial counsel not to call an expert witness generally will not sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St. 3d 412, 2006-Ohio-2815, at ¶118 (citing *State v. Coleman*, 45 Ohio St. 3d 298, 307-08 (1989)). Nothing in the record indicates that independent defense experts would have offered more favorable testimony, so Mr. Capers cannot show that his lawyer's decision caused him prejudice. To the extent that this argument is dependent on evidence outside the record, it is more appropriately reserved for a petition for post-conviction relief. See *State v. Cole*, 2 Ohio St. 3d 112, 114 (1982).

{¶23} In any event, Mr. Capers has not shown that, but for his lawyer's decision not to call an independent expert to examine the gunshot residue kit, there was a reasonable probability that the result of his trial would have been different. Even if an expert had testified that Mr. Capers' hands were negative for gunshot residue, the trial court could have reasonably believed that Mr. Capers had a gun and held it to Ms. Miller's head, although the bag in which the gun was hidden may have protected his hands from any residue when the gun discharged. To the extent that it addressed his lawyer's failure to call expert witnesses, Mr. Capers' fourth assignment of error is overruled.

{¶24} Second, Mr. Capers has argued that his lawyer caused him substantial prejudice by failing to ask the State's eye-witnesses a series of questions Mr. Capers believes would have proven that they had motive to lie and were not credible. In this case, after the State rested its case, the trial court asked Mr. Capers to write a list of questions that he would have liked to have

asked the State's witnesses. The court then reviewed Mr. Capers' list, recalled two eye-witnesses, and asked them each a series of questions that Mr. Capers had proposed. Mr. Capers has not argued that the judge failed to ask any of the questions he proposed nor has he suggested anything his lawyer should have asked on cross-examination. Thus, his argument that his own lawyer should have cross-examined the witnesses following the court's questions is not convincing. Mr. Capers has not shown that his lawyer's performance was deficient nor that he was prejudiced as a result. To the extent that it addressed his lawyer's refusal to ask certain questions of witnesses, Mr. Capers' fourth assignment of error is overruled.

{¶25} Third, Mr. Capers has argued that his lawyer did not respect him, causing him prejudice. According to Mr. Capers, the disrespect is obvious because his lawyer called him stupid. There is no evidence in the record that Mr. Capers' lawyer called his client any names or was otherwise disrespectful toward him. Even assuming that Mr. Capers' lawyer said something disrespectful to him in court, since this case was tried to the bench, the trial court presumably ignored any inappropriate comments by counsel. *State v. Wiles*, 59 Ohio St. 3d 71, 86 (1991). Mr. Capers has not made "an affirmative showing to the contrary" in order to overcome the presumption. *Id.* (citing *State v. Post*, 32 Ohio St. 3d 380, 384 (1987)). Therefore, to the extent it addressed the allegation of disrespect, Mr. Capers' fourth assignment of error is overruled.

## SUFFICIENCY AND MANIFEST WEIGHT

{¶26} The first part of Mr. Capers' third assignment of error is that the verdicts were based on insufficient evidence. Although he has asserted that all of his convictions were based on insufficient evidence, most of his arguments relate to the manifest weight of the evidence. Mr. Capers' only true sufficiency argument is that the State failed to produce sufficient evidence that he was guilty of having a weapon while under disability as charged in count three of the

indictment. He based his argument on the fact that his probation officer, who testified at trial, had no personal knowledge of Mr. Capers' drug convictions, which were reflected in journal entries that were admitted into evidence.

{¶27} Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St. 3d 380, 386 (1997); *State v. West*, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶33. We must determine whether, viewing the evidence in a light most favorable to the prosecution, it could have convinced the average finder of fact of Mr. Capers' guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

{¶28} Mr. Capers was found guilty of violating Section 2923.13(A)(3) of the Ohio Revised Code. Under that subsection, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person . . . has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]"

{¶29} The State offered the testimony of Mr. Capers' parole officer, Jerry Grammes. Mr. Grammes testified that he began working with Mr. Capers in June 2006 when Mr. Capers was released from prison following a conviction for complicity to felonious assault. According to the record, the State introduced (through Mr. Grammes) certified copies of judgment entries from 2002 and 2009, reflecting convictions in Lorain County case numbers 01CR058629, 08CR075957, and 09CR078798. According to the testimony, the judgment entries reflected that Mr. Capers had been previously convicted of possession of cocaine and several counts of possession of marijuana. Mr. Capers has argued that this evidence was insufficient to prove that he had been convicted of an offense involving the possession of a drug of abuse because Mr.

Grammes did not know whether any of the convictions had been overturned on appeal. See R.C. 2945.75(B)(1). Mr. Capers has not cited any authority for the proposition that a witness who testifies in support of a certified copy of a judgment entry must have personal knowledge of the conviction described in the entry. According to the Ohio Revised Code, the State need only provide the entry plus "evidence sufficient to identify the defendant named in the entry as the offender in the case at bar[.]" *Id.* Mr. Grammes identified Mr. Capers by sight, mentioned his date of birth, and testified that each of the judgment entries referred to a case against him. Therefore, the State produced sufficient evidence of Mr. Capers' prior drug convictions. To the extent that it addressed the sufficiency of the evidence, Mr. Capers' third assignment of error is overruled.

{¶30} The second part of Mr. Capers' third assignment of error is that the verdicts were not supported by the manifest weight of the evidence. If a defendant argues that his convictions are against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App. 3d 339, 340 (1986).

### Possession of Cocaine

{¶31} The trial court convicted Mr. Capers of "knowingly . . . possess[ing] . . . a controlled substance." R.C. 2925.11(A). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Mr. Capers has argued that his conviction was

against the manifest weight of the evidence because the police found cocaine in the pocket of a pair of pants that Mr. Capers was not wearing when police initially arrived at Ms. Miller's apartment. Since he did not live there, Mr. Capers has argued that "the pants could have belonged to another" and that he "could not have known that the drugs were in the pants when he put them on[.]"

{¶32} Officer Mark Mitchell testified that, when he entered Ms. Miller's bedroom, he found Mr. Capers lying naked on the bed. According to Officer Mitchell, Mr. Capers asked if he could get dressed and pointed to a pair of pants and shorts. The officer testified that there were no other men in the apartment and the pants appeared to fit Mr. Capers. Mr. Capers later took the stand and never denied that he owned the pants he was wearing that morning. In fact, he testified that the police "asked me where my pants and my clothes [were] . . . [t]hen they . . . gave me my pants . . . [and] I put on my pants." Officer Ben Miracle testified that police did not locate the cocaine during an initial pat-down at the scene, but that he found it later when he was doing a more thorough search at the police station. There is no conflict in the evidence. The police officers testified that they believed the pants belonged to Mr. Capers, and Mr. Capers also referred to the pants as his own. The trial court reasonably concluded that Mr. Capers knowingly possessed the crack cocaine found in the pocket of his own pants.

{¶33} Mr. Capers has also argued that his drug possession conviction is against the manifest weight of the evidence because the forensic scientist who testified about the substance corrected her report to show that the crack cocaine was not adulterated with levamisole as she had originally reported. Elizabeth Doyle testified that she corrected her report after determining that she had made a typo in her initial report. Mr. Capers has argued that Ms. Doyle's testimony is unreliable because of this discrepancy. The trial court believed that the substance found in Mr.

Capers' pants pocket was cocaine base, as reported by Ms. Doyle. Ms. Doyle never wavered on that point. Regardless of whether she had mistakenly included a reference to an adulterant, both reports indicated that the substance was crack cocaine. There is no indication that the trial court lost its way in weighing the evidence in regard to the drug possession charge. To the extent it addressed his conviction for possession of cocaine, Mr. Capers' third assignment of error is overruled.

### Having a Weapon While Under Disability

{¶34} Mr. Capers was also convicted of having a weapon while under disability with a firearm specification. Under Section 2923.13(A)(2) of the Ohio Revised Code, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if . . . [t]he person . . . has been convicted of any felony offense of violence . . . ." He was further convicted of a specification indicating that he "had a firearm on or about [his] person or under [his] control while committing the offense and displayed the firearm, brandished [it], indicated that [he] possessed [it], or used it to facilitate the offense." R.C. 2941.14.5(A).

{¶35} Mr. Capers has argued that he did not have a gun nor did he shoot a gun on the morning in question. He has argued that his convictions are against the manifest weight of the evidence because his witnesses were more credible than the State's witnesses, the gunshot residue test was not reliable, and the police failed to test other people or surfaces for gunshot residue.

{¶36} Mr. Capers has attacked the reliability of the gunshot residue test because he believes the evidence indicates that Sergeant Mayne could have contaminated him with the gunshot residue that was found on his hands. Sergeant David Mayne testified that, sometime before he checked Mr. Capers' pants for weapons before allowing him to dress, he had handled

the Crown Royal bag and the gun he found inside it. There was testimony that gunshot residue can be transferred from person to person or to other surfaces through direct contact. According to Mr. Capers, it would have been more reasonable for the trial court to believe that Mr. Capers' hands were contaminated by gunshot residue transferred by Sergeant Mayne from the gun or the bag to the pants and finally to Mr. Capers' hands as opposed to believing that the gun was in Mr. Capers' hand when it discharged.

{¶37} Mr. Capers has also argued that the results of the test were not credible because, according to the forensic testimony, both hands were positive for residue, but Mr. Capers testified that police tested only his right hand. The officer who submitted the test, however, testified that he swabbed both of Mr. Capers' hands as required by the kit's instructions. Having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, this Court cannot say that the trial court lost its way in resolving the conflicts in the evidence related to the gunshot residue test.

{¶38} Mr. Capers has argued that his witnesses were more credible than the State's witnesses because Mr. Ortiz and Ms. Roark both suffer from mental disorders and Mr. Ortiz's testimony did not match his statement made to police on the day of the incident. Mr. Ortiz testified that he was being treated for depression and that he had attempted to commit suicide. He said that he takes a prescription medication for his depression, but that he was not taking it on the night of the incident. He also testified that the medicine does not affect his memory. Ms. Roark testified that she takes prescription medication and regularly sees doctors and therapists to treat her bipolar and borderline personality disorders. She also said that she has been on the same dosage of the same medication for four years and she does not suffer from any side effects of it.

{¶39} Mr. Capers has argued that the manifest weight of the evidence supported his version of events, including that there was no gun involved in the incident. Mr. Ortiz testified that he was sleeping at Ms. Roark's apartment when he awoke to the sound of Ms. Miller screaming. He said that Mr. Capers was outside in the parking lot and Ms. Miller and he were screaming and arguing through the window of Ms. Miller's apartment. Later, someone let Mr. Capers into Ms. Roark's apartment. Mr. Capers had a purple and gray bag with something inside that was shaped like a gun. According to Mr. Ortiz, Mr. Capers held it up to Ms. Miller's temple for a moment, then lowered it and discharged a bullet into the living room floor. Mr. Capers has argued that Mr. Ortiz is not credible because he never saw a gun and his written statement to police did not include a reference to a gun being fired or what happened to the gun after the incident was over.

{¶40} Mr. Ortiz testified that he never saw the gun, but that the object in the bag appeared to be a gun because of its shape. He testified that he knew a round had been shot from the gun when he heard the sound of a gun being discharged and saw the "powder[ ]" after it went off. Sergeant Mayne testified that, on the morning of the incident, Mr. Ortiz told him that Mr. Capers came into Ms. Roark's apartment, put a gun to Ms. Miller's head, and then shot a round into the floor.

{¶41} Ms. Roark gave a similar statement to police. When police arrived at her apartment, she gave Sergeant Mayne a Crown Royal bag with a .32 caliber revolver inside. Sergeant Mayne testified that the bag had a hole in it with burning around the edges. He testified that this was consistent with Ms. Roark's report about a gun being shot from inside the bag. She also showed police a hole in her living room carpet, which she claimed was caused by the bullet from that gun. She told police that she had seen smoke coming from that area of the floor after

the gun went off. Sergeant Mayne testified that he pulled back the carpet and saw that the hole went through the carpet and the padding, but the bullet appeared to have disintegrated when it hit the concrete floor beneath. He described a "splatter of concrete debris that lined up with the holes" in the carpet and the padding. Although police did not test the carpeting for gunshot residue, the trial court stated that it believed Sergeant Mayne was capable of recognizing a bullet hole in the carpet.

{¶42} After the State rested, Mr. Capers presented the testimony of Ms. Miller and then testified on his own behalf. Both Ms. Miller and Mr. Capers testified that, although they had engaged in a mild argument early that morning, it never became violent and there was no gun involved. They both testified that they were in Ms. Roark's apartment briefly, but they never saw a gun that morning and never heard one discharge. They both said Mr. Capers does not carry a gun, but they had heard that Mr. Ortiz did.

{¶43} According to Sergeant Mayne, after taking a report from Ms. Roark, he went across the hall to Ms. Miller's apartment. Ms. Miller took some time to answer the door, then refused to tell him whether Mr. Capers was in her apartment. Ms. Miller denied any knowledge of why the police would have been called and demanded to see a warrant. Sergeant Mayne told her they were there to secure her safety and entered the apartment. Sergeant Mayne testified that he found Mr. Capers in Ms. Miller's bed. Mr. Capers was cooperative, but denied all knowledge of an argument, a gun, or even being in Ms. Roark's apartment that morning. Sergeant Mayne then questioned Ms. Miller separately, and she also denied having been in Ms. Roark's apartment, having argued with Mr. Capers, and knowing anything about a gun. After speaking again with Ms. Roark and Mr. Ortiz, Sergeant Capers tried again to speak with Ms. Miller, but she would not make any statement about the incident. According to Sergeant Mayne, when

police brought Mr. Capers out of the bedroom, Ms. Miller "started making comments to him that it's not her, she's not signing [any] . . . domestic violence [complaint]."

**{¶44}** Based on the evidence, the trial court may have reasonably concluded that Ms. Miller and Mr. Capers were romantically involved and coordinated a fictional account of their interaction that morning in order to protect Mr. Capers. Both of them initially told police that they had not had any altercation nor had they been in Ms. Roark's apartment, but later both testified that they had a mild argument about Mr. Capers being late to babysit and admitted that both of them had been in Ms. Roark's apartment at some point that morning. The trial court determined that, despite concealing it in a bag, Mr. Capers knowingly had or used a firearm and brandished or indicated that he possessed it when he held it to Ms. Miller's head before firing it into the floor. In considering all the evidence and weighing the credibility of the witnesses, this Court cannot say that the trial court lost its way and created a manifest miscarriage of justice in resolving the conflicts in the evidence. To the extent that it addressed Mr. Capers' convictions for having a weapon while under disability with a firearm specification, his third assignment of error is overruled.

### Aggravated Menacing

**{¶45}** Mr. Capers was also convicted of aggravated menacing. He has argued that this conviction is against the manifest weight of the evidence because Ms. Miller testified that she never feared for her life or even felt that she was in danger. Under Section 2903.21(A) of the Ohio Revised Code, "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . ." Ms. Miller testified that she was angry with Mr. Capers for arriving late, but that she "wasn't in fear for [her] life, or any type of danger or anything." Both Ms. Roark and Mr. Ortiz contradicted that

testimony. Ms. Roark described Ms. Miller as upset, aggravated, and crying when she first arrived at Ms. Roark's apartment. Later, they heard Mr. Capers yelling up from the parking lot, threatening to shoot Ms. Miller's car. After he got into the building and coaxed Ms. Miller to open Ms. Roark's apartment door, Ms. Miller willingly left with him, but quickly returned and locked Ms. Roark's door behind her. Mr. Ortiz testified that Ms. Miller was "screaming," "shaking," and "really scared" when she returned to Ms. Roark's apartment. This time, when Mr. Capers convinced Ms. Miller to open Ms. Roark's door, Mr. Capers stepped inside and immediately put a gun to Ms. Miller's head. The trial court seems to have determined that the testimony of Mr. Ortiz and Ms. Roark was more credible than that of Ms. Miller and Mr. Capers. The court determined that Ms. Miller feared physical harm when she fled into Ms. Roark's apartment and when Mr. Capers placed the gun to her temple. This Court cannot say that the trial court lost its way in resolving the conflicts in the evidence. To the extent it addressed the aggravated menacing conviction, Mr. Capers' third assignment of error is overruled.

## OTHER ACTS

**{¶46}** Mr. Capers' fifth assignment of error is that the trial court should not have admitted testimony about his alleged violent history with Ms. Miller. Under Rule 404(B) of the Ohio Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible . . . to show action in conformity therewith." Such evidence, however, may be admissible for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

**{¶47}** Mr. Capers has argued that the trial court should have excluded two of Ms. Roark's statements under Evidence Rule 404(B). First, on direct examination by the State, Ms. Roark said that "there were times when [Mr. Capers] would hit [Ms. Miller]. And she would hit

him, too." Ms. Roark offered this in answer to a question about what Ms. Miller meant when she asked Ms. Roark to "listen for her" before she went back to her own apartment with Mr. Capers. Second, during the trial court's questioning of Ms. Roark, she testified that "Mr. Capers was hitting her and abusing her, and I myself just got out of an abusive relationship, and I suggested that she [do] the same thing, too." Ms. Roark made this statement in response to a question about why she encouraged Ms. Miller to break up with Mr. Capers.

{¶48} Mr. Capers did not object to the admission of either of these statements. Therefore, he has forfeited all but plain error on appeal. *State v. Dent*, 9th Dist. No. 20907, 2002-Ohio-4522, at ¶6. An appellate court may take notice of plain errors "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St. 2d 91, paragraph three of the syllabus (1978); see also Crim. R. 52(B). To prevail, Mr. Capers would have to show that, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Murphy*, 91 Ohio St. 3d 516, 532 (2001) (quoting *State v. Campbell*, 69 Ohio St. 3d 38, 41 (1994)).

{¶49} The trial court did not commit plain error by permitting Ms. Roark to make these two statements. Not only was there plenty of other evidence tending to show that Mr. Capers had committed the crimes for which he was convicted, the trial court acquitted him of two charges, including one for domestic violence. Furthermore, Mr. Capers tried his case to the court. To the extent that inadmissible evidence may have been received, the trial court is presumed to have disregarded it in making its decision. *State v. Post*, 32 Ohio St. 3d 380, 384 (1987) ("this court indulges '. . . in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'") (quoting *State v. White*, 15 Ohio St.

2d 146, 151 (1968)).  Mr. Capers has not affirmatively shown that the trial court relied on either of the two statements by Ms. Roark.  Mr. Capers' fifth assignment of error is overruled.

CONCLUSION

{¶50}  Mr. Capers' second assignment of error is overruled.  The trial court did not deny Mr. Capers his right to self-representation and the court's indulgence of his requests to be involved in his own defense, if error, were invited by Mr. Capers and did not rise to the level of plain error.  Mr. Capers' third assignment of error is overruled because his convictions were based on sufficient evidence and were not against the manifest weight of the evidence.  Mr. Capers' fourth assignment of error is overruled because he has not demonstrated that his lawyer's performance was deficient or that there is a reasonable probability that, but for his lawyer's performance, the result of his trial would have been different.  Mr. Capers' fifth assignment of error is overruled.  The trial court did not commit plain error by permitting Ms. Roark to testify about Mr. Capers' violent history with Ms. Miller.  His sixth assignment of error is overruled because the trial court did not commit plain error by failing to inquire into the attorney-client relationship in order to determine whether his lawyer should have been dismissed and replaced.  Mr. Capers' first assignment of error is sustained because the trial court failed to notify Mr. Capers at his sentencing hearing that he would be subject to post-release control.  The judgment of the Lorain County Common Pleas Court is reversed with respect to the post-release control it imposed.  The remainder of the judgment is affirmed.  The cause is remanded to the trial court for the limited purpose of allowing it to follow the procedures set forth in Section 2929.19.1 of the Ohio Revised Code.

Judgment affirmed in part,
reversed in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to both parties equally.

CLAIR E. DICKINSON
FOR THE COURT

CARR, P. J.
WHITMORE, J.
CONCUR

APPEARANCES:

ALLISON L. MANNING, Attorney at Law, for Appellant.

DENNIS WILL, Prosecuting Attorney, and BILLIE JO BELCHER, Assistant Prosecuting Attorney, for Appellee.